UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| Plaintiff, | § | |
| v. | § | CIVIL NO. |
| | § | |
| APPROXIMATELY 28,107 MASTER | § | |
| CASES OF CIGARETTES, | § | |
| | § | |
| APPROXIMATELY 1,600 MASTER | § | |
| CASES OF CIGARETTES, | § | |
| Defendants. | § | |

## VERIFIED COMPLAINT FOR CIVIL FORFEITURE
## IN REM AND NOTICE TO POTENTIAL CLAIMANTS

Now comes Plaintiff, the United States of America, and files this action for forfeiture *in rem* against the above-entitled Defendant Properties. The United States respectfully alleges on information and belief as follows:

### NATURE OF THE ACTION

1.      This is a civil action for forfeiture in rem against the Defendant Property pursuant to the following: 19 U.S.C. §§ 1595a(a), 1595a(b) & 1595a(c); 18 U.S.C. § 981(a)(1)(A); 18 U.S.C. § 981(a)(1)(C); 18 U.S.C. § 981(a)(1)(D); and 18 U.S.C. § 2344.

### JURISDICTION AND VENUE

2.      This Court has jurisdiction pursuant to 28 U.S.C. §§ 1345, 1355, and 19 U.S.C. §§ 1608, 1610. The Defendant Property is located in the Southern District of Texas or are forfeitable due to acts and omissions occurring within the Southern District of Texas and are therefore within the jurisdiction of this Court. Venue is proper in this Court pursuant to 28 U.S.C. §§ 1355, 1391(b) and 1395(a) and (b).

1

**DEFENDANT PROPERTY SUBJECT TO FORFEITURE**

3.　　Defendant Property 1 is approximately 28,107 master cases of cigarettes, also measured as 1,361,552 cartons of cigarettes, detailed as follows:

Table 1: Defendant Property 1
Cigarettes Seized on or about March 6, 2024

| *Cigarette Type* | *Approx. No. of Master Cases* | *Approx. No. of Cartons* |
|---|---|---|
| Golden Deer Red | 850 | 42,500 |
| Garanon | 325 | 16250 |
| Link Rojo | 2,100 | 105,000 |
| Boots | 1,601 | 80,050 |
| Action Menthol | 1,408 | 70,400 |
| Marshal Full Flavor | 381 | 19,052 |
| President | 5,800 | 29,0000 |
| Scenic 101 | 800 | 40,000 |
| Boots Grape Mint | 309 | 15,450 |
| Sonora Ice | 1,050 | 52,500 |
| Beach Palm | 350 | 17,500 |
| Reno Full Flavor | 829 | 41,450 |
| Indy | 1,279 | 63,950 |
| Malaga | 677 | 33,850 |
| Marine | 1,013 | 50,650 |
| Cacique Full Flavor | 652 | 32,600 |
| Cacique Gold | 321 | 16,050 |
| Cacique Menthol | 132 | 6,600 |
| Golden Deer | 165 | 8250 |
| Boots Ice Cherry | 146 | 7300 |
| Lake Green | 146 | 7300 |
| Lake Blue | 199 | 9950 |
| Lake Red | 737 | 36850 |
| Lake Blue & White | 239 | 11950 |
| Win | 200 | 10000 |
| Brass | 200 | 10000 |
| Marble | 202 | 10100 |
| Link Blanco | 90 | 4500 |
| Jaisalmer Green | 1570 | 78500 |
| Elegante | 410 | 20500 |
| D&J Royal Blend | 1059 | 52950 |
| Soberano | 477 | 23850 |

| | | |
|---|---|---|
| Jaisalmer Red | 50 | 2500 |
| Alamo | 1100 | 55000 |
| Catalina Red | 1240 | 60000 |
| | | |
| **Total** | **28,107** | **1,361,552** |

Defendant Property 2 is approximately 1,600 master cases of cigarettes, also measured as 80,000 cartons of cigarettes, detailed as follows:

Table 2: Defendant Property 2
Cigarettes Seized on or about December 2, 2022

| *Cigarette Type* | *Approx. No. of Master Cases* | *Approx. No. of Cartons* |
|---|---|---|
| Malaga | 2 | 100 |
| Maypole | 1 | 50 |
| Link | 1041 | 52050 |
| D&J | 59 | 2950 |
| Soberano | 247 | 12350 |
| Win | 250 | 12500 |
| | | |
| **Total** | **1,600** | **80,000** |

In total, Defendant Properties consist of approximately 29,707 master cases of cigarettes, also measured as approximately 1,483,352 cartons of cigarettes. Defendant Property 2 was seized on or about December 2, 2022, at or near Pharr, Texas, by CBP Officers and HSI Special Agents. Defendant Property 1 was seized by CBP Officers and HSI Special Agents pursuant to a search and seizure warrant on or about March 6, 2024, from RGV Warehouse at or near McAllen, Texas. Defendant Properties were assessed by CBP and estimated as having a customs and duties value of approximately $26 million U.S. dollars.

**STATUTORY BASIS FOR FORFEITURE**

4.      The Defendant Properties are subject to forfeiture under the following: 19 U.S.C. §§ 1595a(a) and (c); 18 U.S.C. §§ 981(a)(1)(A), (a)(1)(C), and (a)(1)(D); and 18 U.S.C. § 2344.

5.      The Defendant Property is subject to forfeiture under 19 U.S.C. §§ 1595a and 1608.

19 U.S.C. § 1595a(c) provides that,

> "Merchandise which is introduced or attempted to be introduced into the United States contrary to law shall be treated as follows:
> (1) The merchandise shall be seized and forfeited if it — (A) is stolen, smuggled, or clandestinely imported or introduced;
> (2) The merchandise may be seized and forfeited if — (A) its importation or entry is subject to any restriction or prohibition which is imposed by law relating to health, safety, or conservation and the merchandise is not in compliance with the applicable rule, regulation, or statute; (B) its importation or entry requires a license, permit or other authorization of an agency of the United States Government and the merchandise is not accompanied by such license, permit, or authorization; (C) it is merchandise or packaging in which copyright, trademark, or trade name protection violations are involved…"

19 U.S.C. § 1595a(d) provides that,

> "Merchandise exported or sent from the United States or attempted to be exported or sent from the United States contrary to law, or the proceeds or value thereof, and property used to facilitate the exporting or sending of such merchandise, the attempted exporting or sending of such merchandise, or the receipt, purchase, transportation, concealment, or sale of such merchandise prior to exportation shall be seized and forfeited to the United States."

19 U.S.C. § 1608 provides that property subject to forfeiture under Title 19 U.S.C. may be subject to civil judicial forfeiture proceedings. Here, there are facts as alleged that show Defendant Properties: constitutes merchandise introduced or attempted to be introduced into the United States contrary to law; and constitutes merchandise exported or attempted to be exported from the United States contrate to law and facilitated the same.

6.      The Defendant Property is subject to forfeiture under 18 U.S.C. § 2344(c) as they may be considered "contraband cigarettes" as defined by 18 U.S.C. § 2341(2).

7.      The Defendant Property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(C), which provides for the forfeiture of any property, real or personal, which constitutes or is derived from proceeds traceable to certain qualifying offenses, including:

- 18 U.S.C. § 541 - Entry of goods falsely classified;
- 18 U.S.C. § 542 - Entry of goods by means of false statements;
- 18 U.S.C. § 545 - Smuggling goods into the United States;
- 18 U.S.C. § 549 - Removing goods from customs custody;
- 18 U.S.C. § 554 - Smuggling goods from the United States; and,
- 18 U.S.C. § 1343 - Fraud by wire.

Here, there are facts as alleged that show that the property, real or personal, constitutes and is derived from proceeds traceable to the above offenses.

8.    The Defendant Property is subject to forfeiture under 18 U.S.C. § 981(a)(1)(D), which provides for the forfeiture of any property, real or personal, which represents the gross receipts obtained from a violation of certain listed offenses, including:

- 18 U.S.C. § 1001 - Fraud and false statements;
- 18 U.S.C. § 1031 - Major fraud against the United States; and,
- 18 U.S.C. § 1343 - Fraud by wire.

Here, there are facts as alleged that show that the property, real or personal, constitutes and is derived from proceeds traceable to the above offenses.

9.    The Defendant Property is also subject to forfeiture under 18 U.S.C. § 981(a)(1)(A), which provides for the forfeiture of any property, real or personal, involved in a transaction or attempted transaction in violation of section 18 U.S.C. §§ 1956, 1957, or 1960, or any property traceable to such property. 18 U.S.C. § 1956(c)(7) defines the following offenses as specified unlawful activity:

- 18 U.S.C. § 541 - Entry of goods falsely classified;
- 18 U.S.C. § 542 - Entry of goods by means of false statements;
- 18 U.S.C. § 545 - Smuggling goods into the United States;
- 18 U.S.C. § 549 - Removing goods from customs custody;
- 18 U.S.C. § 554 - Smuggling goods from the United States; and,
- 18 U.S.C. § 1343 - Fraud by wire;

Here, there are facts as alleged that show that funds associated with these violations were transacted in a manner to disguise their origin and purpose in violation of 18 U.S.C. §

1956(a)(1)(B)(i), and to promote the unlawful scheme in violation of 18 U.S.C. §§ 1956(a)(1)(A)(i) & (a)(2)(A). There are also facts as alleged that show transactions of greater than $10,000 in proceeds derived from specified unlawful activity in violation of 18 U.S.C. § 1957. There are also facts as alleged that show that the property was involved in the provision of unlicensed money transmissions in violation of 18 U.S.C. § 1960.

### FACTUAL BASIS FOR FOFEITURE

Table of Contents

| | | |
|---|---|---|
| I. | Introduction | 6 |
| II. | Investigation Background | 14 |
| III. | Smuggling and Fraud Schemes | 15 |
| IV. | Money Laundering Schemes | 22 |
| V. | Conclusion | 27 |

### INTRODUCTION

10.     The Department of Homeland Security (DHS), Homeland Security Investigations (HSI), United States Customs and Border Protection (CBP), and other assisting agencies, have been investigating large-scale smuggling of contraband cigarettes, alcohol, and other goods, from the United States (U.S.) into Mexico. The investigation has uncovered complex fraud and trade diversion schemes that seek to avoid government permitting, taxation, and customs oversight in the United States and Mexico. The schemes also involve complex international financial arrangements designed to hide the source of the funds used in the schemes, disguise the ultimate recipients of funds paid in the schemes, as well as to transact funds used to promote the fraud and trade diversion operations. Rio Grande Valley Duty Free LLC (RGV), a business incorporated under the laws of the State of Texas, is the focal point of unlawful activity detailed below. This complaint does not represent the totality of the information known to investigators about these activities, and investigation remains ongoing.

11.    **The In-Bond System**. Smuggling groups often violate various laws and regulations governing the U.S.'s in-bond import-export system ("In-Bond System"), as well as U.S. federal and state laws and regulations governing tobacco and alcohol. The In-Bond System is primarily governed by Title 19 U.S.C. and Title 19 C.F.R. and is administered under the direct regulatory control of CBP. The In-Bond System allows for merchandise to be shipped through the United States for re-export (thus never legally entering U.S. commerce) without rigorous customs inspections or payment of taxes and duties. Goods to be shipped through the In-Bond System are generally declared to CBP at location of entry, which include sea and land ports (when merchandise originates overseas) or free trade zones and approved manufacturers (when merchandise originates within the U.S.). Once entered in the In-Bond System, statue and regulation requires that merchandise be maintained in-bond (for example, properly sealed in a container or held in a secure in-bond warehouse). In essence, merchandise in the In-Bond System remains in CBP custody. Statute and regulation dictate that DHS (through CBP and HSI) are the supervising and investigative agencies that administer and oversee the In-Bond System.

12.    Under relevant statute and regulation, if merchandise is properly exported through the U.S. using the In-Bond System, the relevant transshipping parties are exempt from certain customs inspection requirements, as well as certain duties, taxes, and fees in the United States. Likewise, the In-Bond System allows for duty-free operators to sell certain merchandise at or near ports of entry under relevant statute and regulation. If merchandise is removed from the In-Bond System prior to export or sale at a duty-free establishment, it is generally deemed to enter U.S. commerce, and is therefore subject to U.S. customs inspection requirements, as well as applicable duties, taxes, and fees.

13.     To become licensed by CBP to operate a bonded carrier or bonded warehouse/duty-free establishment, individuals and entities generally must apply with CBP for approval, pass background checks, and provide funds to CBP for their customs bond. Bonded carriers, bonded warehouse operators, and duty-free operators are subject to regular inspections by CBP Officers by law. Bonded operators also receive periodic guidance from CBP about proper process and protocols under statute and CBP regulations.  RGV operated a licensed customs bonded warehouse and duty free store near the Hidalgo, Texas, port of entry.

14.     **Cigarettes and Smuggling Operations**. Cigarettes are generally sold in bulk to distributors in units called "master cases". Generally, a master case of cigarettes contains 50 cartons of cigarettes, with a carton containing ten (10) packs, with each pack containing twenty (20) cigarettes. Thus, generally, each master case generally contains 10,000 cigarettes. Depending on packaging, a full-length sea-shipping container can hold up to 2,000 master cases of cigarettes, and a full-length tractor trailer can hold up to 1,300 master cases. Thus, Defendant Properties, consisting of the above defined approximately 29707 master cases, also measured as approximately 1,483,352 cartons, contains approximately 14,833,520 packs of cigarettes, or approximately 296,670,400 individual cigarettes.

15.     Many of the brands used in cigarettes smuggling operations are not legal for sale in the U.S. or the country of destination, generally Mexico. Such brands are known as "illicit whites" in that they have no known legal market. A particular brand or shipment of cigarettes may be "illicit whites" if the master cases and cartons of cigarettes lack the necessary permitting stamps and markings for their declared country of consumption, as well as through customs and taxation information for the destination country.

16.    **Customs Fraud Schemes**. Cigarette smuggling groups often commit customs fraud and remove merchandise from the In-Bond System for smuggling in the last stretch of the in-bond shipping and warehousing process. To achieve this goal, smuggling groups will commit fraud and divert merchandise using the following means and methods: removal of bonded merchandise from bonded warehouses without required seals and documentation; transport of bonded merchandise by unapproved carriers; concealment of transported bonded merchandise with other non-bonded goods (or "cover loads"); failure to declare the export of bonded merchandise to CBP; use of fictitious export documents that fail to declare the bonded merchandise at the time of export or inspection at a port of entry; submission of fraudulent records to CBP to disguise the smuggling of bonded merchandise; and failure to submit complete records to CBP to disguise the smuggling of bonded merchandise. These activities violate various statutes and regulations including the following.

17.    The activity detailed below constitutes violations of 18 U.S.C. § 541, Entry of goods falsely classified, in that cigarettes were entered into U.S. commerce through false classification as in-bond goods. The activity detailed below constitutes violations of 18 U.S.C. § 542, Entry of goods by means of false statements, in that the cigarettes entered into U.S. commerce after representation to CBP that the cigarettes would not enter U.S. commerce and that the cigarettes would be exported in compliance with the In-Bond System. The activity detailed below is also in violation of 18 U.S.C. § 545, Smuggling goods into the United States, in that the merchandise entered U.S. commerce contrary to law, specifically being removed from the In-Bond System without authorization from CBP or notice to CBP and entry undeclared into U.S. commerce. The activity detailed below is in violation of 18 U.S.C. § 549, Removing goods from customs custody, in that the cigarettes were removed from the In-Bond System without

authorization from CBP or notice to CBP. The activity detailed below is also in violation of 18 U.S.C. § 554, Smuggling goods from the U.S., in that the cigarettes were hidden with cover loads, accompanied by false or incomplete documentation, and carried by non-approved carriers during their export from the U.S.

18.    **Contraband Cigarette Scheme**. When smuggling groups remove cigarettes from the In-Bond System for smuggling, they fail to obtain the necessary permits, pay the required taxes, or procure the necessary signage or stamps for tobacco products entering U.S. commerce. Thus, the cigarettes become "contraband cigarettes" as defined by 18 U.S.C. § 2341(2), and distribution of such cigarettes is a violation of 18 U.S.C. § 2342. The activity detailed below is in violation of 18 U.S.C. §§ 2342 and 2341(2), Trafficking in contraband cigarettes, in that when the cigarettes are unlawfully removed from the In-Bond System, they lack the necessary permits, proof of taxes paid, and do not carry the necessary signage or stamps for tobacco products to enter U.S. commerce.

19.    **Wire Fraud Schemes**. The investigation has found that smuggling groups often commit wire fraud as part of the smuggling operation. Bonded warehouse operators, duty-free operators, and bonded carriers are generally required to submit documentation to CBP related to bonded shipments they receive and dispose of. These submissions are often done via an online portal and may be made or supplemented by email or other electronic communication to CBP as well. Persons working in smuggling operations also regularly correspond with CBP personnel about In-Bond System operations. Smuggling groups regularly submit fraudulent, false, and materially incomplete information to CBP using these means and methods to disguise their smuggling activities. Smuggling groups regularly use cellular telephone messaging services, as well as email and other electronic messaging means to arrange smuggling operations. Smuggling

groups also use wire transfers to move and transact funds related to the fraud and smuggling operations. This conduct is in violation of multiple sections of Title 18 U.S.C. including the following.

20. The facts as detailed below violate 18 U.S.C. § 1001, False statements, in that persons associated with RGV represented, or caused to be represented, to CBP that in-bond shipments of cigarettes were disposed of by RGV as required by applicable statute and regulation, representations that were demonstrably false. This activity is also in violation of 18 U.S.C. § 1031, Major fraud against the United States, in that the overall smuggling and fraud schemes as detailed above constituted a broad scheme to defraud the United States by hiding unlawful activity from government oversight, provided the government with false information, and deprived the government of owed duties, fees, and taxes, among other harms. In addition, this activity was in violation of 18 U.S.C. § 1343, Fraud by wire, in that RGV's smuggling and fraud schemes were executed using a number of means of transmitting information in interstate commerce by qualifying means, including by telephone contacts, emails, submissions of information using internet connected electronic applications, and wire transfers at financial institutions.

21. **Money Laundering Schemes**. The above smuggling and fraud schemes implicate significant money laundering operations as well. First, smuggling groups receive significant payments from sources outside the United States to fund the purchase and transport of smuggled cigarettes. These funds, regularly in the tens of thousands of dollars per transaction, fund and perpetuate the smuggling schemes, including by funding the purchase of merchandise for smuggling, payment for transport, payment of rent and taxes for facilities, and compensation for facilitating persons. Investigators have also found that the bonded warehouse operators then

conduct wire transactions with merchandise providers in the United States and overseas. This conduct is in violation of 18 U.S.C. §§ 1956 (a)(1)(A)(i) & (a)(2)(A).

22.     Second, many transactions are often conducted in ways that disguise the source of and recipients of funds used to further the scheme. In certain instances, wire transfers are made from entities in Mexico to accounts in the United States. Investigators have determined that many of the entities in Mexico appear to have no legitimate presence or operations and appear to be shell companies. In other instances, smuggling groups recruit couriers to bring bulk cash into the United States from Mexico. While much of the cash is declared, Investigators have found that many of the declared beneficial owners of the incoming cash appear to be fictitious persons, shell companies, or currency exchanges (a.k.a "casas de cambio").

23.     The facts detailed below constitute money laundering offenses in that they: (1) constituted transactions to promote the smuggling and fraud schemes; (2) constituted transactions involving the proceeds of the smuggling and fraud schemes; and (3) obscured the sources and ultimate recipients of funds related to the conspiracy's smuggling and fraud activities. This activating is in violation of Title18 U.S.C., including the following. This activity is in violation of 18 U.S.C. § 1956 (a)(1)(a)(i) & 1956(a)(2)(A), Facilitation of specified unlawful activity in that RGV received payments from sources outside the United States to fund the purchase and transport of smuggled cigarettes. This activity is also in violation of 18 U.S.C. § 1956(a)(1)(B)(i) & (a)(2)(B)(i), Disguising sources and recipients of proceeds of specified unlawful activity, in that RGV enabled obscuring the sources of funds it received by accepting cash deposits, and by wiring money to intermediaries.  This activity is in violation of 18 U.S.C. § 1957, Transacting in proceeds of a specified unlawful activity, in that RGV regularly transacted in funds that constituted the proceeds of unlawful specified activity in amounts over $10,000.

24.     **Unlicensed Money Transmission Scheme**. The above fraud and money laundering schemes are also facilitated and accompanied by unlicensed money transmission. Here, the In-Bond and duty-free operators in and around McAllen, Texas, use bank accounts registered to the businesses to process payments for a number of different entities associated with cigarette smuggling. The transactions often follow one of two patterns. In pattern one, the transactions often occur as follows: first, funds are deposited into accounts for businesses or currency exchanges in Mexico; second, funds are withdrawn in Mexico in U.S. dollars and physically transported into the United States; third, the cash is deposited into U.S. bank accounts of the In-Bond and duty-free operators; and fourth, the funds are then wired to accounts associated with providers of cigarettes and other merchandise used in the smuggling operation.

25.     In pattern two, the transactions often occur as follows: first, funds are deposited into accounts for businesses or currency exchanges in Mexico; second, funds are wired into U.S. bank accounts of the In-Bond and duty-free operators; and third, the funds are then wired to accounts associated with providers of cigarettes and other merchandise used in the smuggling operation. The investigation has determined that these transaction patterns have no discernable legitimate business purpose, and rather appear to function solely as a means to facilitate the flow of cash from sources outside the United States to providers of cigarettes and other merchandise used in smuggling operations.

26.     This activity is in violation of 18 U.S.C. § 1960, Unlicensed money transmitting, in that RGV functioned not as a logistics provider, but as a financial facilitator for the movement of illicit funds, making it an unlicensed money transmitting operation.

INVESTIGATION BACKGROUND

27.     **Victor M. Guerra Duty Free, LLC**. Beginning in or about 2013, a customs bonded warehouse operating under the name Victor M. Guerra Duty Free, LLC, ("VMGI") located near McAllen, Texas, engaged in smuggling cigarettes and alcohol from the United States into Mexico. In early 2020, HSI, CBP, and assisting law enforcement agencies took enforcement action against VMGI and associated persons and locations.

28.     Until February of 2020, VMGI was used to facilitate the large-scale smuggling of cigarettes from the U.S. into Mexico. To support this process, VMGI staff would create false sales tickets to hide the smuggling from CBP. Other involved individuals would load cigarettes from VMGI onto tractor trailers hidden by cover loads, and the cigarettes would be smuggled into Mexico without notification to CBP. Person 1 ("P1") participated the VMGI smuggling operation.     While     VMGI     ceased     cigarette     operations     following enforcement     actions     and prosecutions in 2020, smuggling operations involving P1 and others continued.

29.     **Rio Grande Duty Free LLC**. Beginning in or about 2021, the smuggling operation continued using RGV. RGV was managed by Person 2 ("P2"), and RGV's legal entity was nominally under the control of Person 3 ("P3"). RGV operated a duty-free store located at 719 S Joe Pate Blvd, Hidalgo, TX 78557 (RGV Store), and a customs bonded warehouse located at 7825 S. 23rd Street Ste 3., McAllen, TX 78503 (RGV Warehouse). The smuggling operation also utilized a towing lot located at 109 W Zavala Dr, Pharr, TX 78577 (RGV Lot).

<u>SMUGGLING AND FRAUD SCHEMES</u>

30.    **Summary of Smuggling and Fraud Schemes**. As alleged below, RGV engaged in a complex scheme to smuggle cigarettes from the U.S. into Mexico. This scheme involved the violation of numerous U.S. customs laws and regulations, the submission of false and fraudulent information to U.S. authorities, and the use of wire communications to facilitate the scheme.

31.    **Duty-Free Operations**. Under the statutes and regulations applicable to customs in-bond and duty-free operations, RGV was approved by CBP to operate as follows. RGV was required to first receive and store shipments of cigarettes in-bond at the RGV Warehouse, where it was required to maintain proper records related to each shipment received. Second, RGV was required to restock its RGV Store with cigarettes and other duty-free merchandise from stocks held at RGV Warehouse. These transfers were required to come directly from RGV Warehouse to RGV Store, with the merchandise remaining under the legal custody and control of CBP during this process. Third, RGV was required to sell duty-free merchandise (including cigarettes) to customers at RGV Store, and RGV was required to verify the customer's direct exit from the United States into Mexico through the Hidalgo, TX, Port of Entry (POE).

32.    Investigators have conducted multiple customs inspections on RGV locations, including at RGV Store and Warehouse, including on 1/18/2024 at RGV Store and on 11/29/2023 at RGV Warehouse. During these inspections, RGV Store had very little inventory (even as little as a few hundred cartons of cigarettes). In contrast, RGV Warehouse contained significant amounts of cigarettes believed to be "illicit whites".

33.    In or about August 2022, investigators interviewed P3, the nominal owner-operator of RGV. P3 claimed that P2 approached P3 about becoming the on-paper owner of a customs bonded warehouse in approximately March of 2021. P3 had no prior customs or import/export

experience. P3 also stated that P2 managed RGV Warehouse. P3 stated P2 and another entity took care of RGV's paperwork, and that P3 had been informed that RGV's business was "delicate". P3 indicated that RGV received tractor-trailers of cigarettes at RGV Warehouse, and from there cigarettes were taken to RGV Store. P3 believed that each container of cigarettes was purchased for approximately $60,000. P3 indicated RGV made $30,000-$40,000 gross profit a month on cigarettes.

34.    In or about August 2022, investigators interviewed P2. P2 confirmed being a previous employee of P3 at another business. P2 stated that RGV entered the import-export business in approximately March 2021. P2 made purchases of cigarette shipments (full sea containers) from several providers. P2 detailed how RGV was managed. P2 maintained invoices and completed a daily report of RGV's activity. P2 stated that RGV made a profit of about $30,000 a month. P2 handled purchases, sales, and logistics for cigarettes via phone and email communications. P2 arranged for vans to transport purchased cigarettes from RGV Warehouse into Mexico on behalf of buyers in Mexico. P2 indicated that P3 had no contacts in the business and had no idea how the operation worked.

35.    **RGV Counterfeit Cigarettes**. In August of 2022, investigators inspected RGV Warehouse. The inspection found master cases of "Seneca" brand cigarettes marked as, "Fabricado Por: Grand River Enterprises (GRE), Six nations LTD, P.O. Box 760, Ohsweken, Canada, NOA 1MO." This information was also printed on the individual packs of "Seneca" brand cigarettes within the master cases. SAs determined that the Seneca cigarettes found in August of 2022 at RGV were not manufactured in Canada but were manufactured in Vietnam. Representative of GRE indicated that GRE products are not manufactured in Vietnam, and that such products were counterfeit. In the August 2022 statement, P2 indicated knowing that the Seneca cigarettes at RGV

were from Vietnam, not Canada, and were fake, but bought them anyways because they were cheaper.  The counterfeit "Seneca" brand cigarettes were detained under Title 19 U.S.C. authority.

36.    **Seizures of Smuggled Cigarettes**. On or about December 2, 2022, a tractor trailer was stopped for outbound inspection at the Pharr, Texas, Port of Entry (POE). CBP conducted a customs inspection on the trailer and discovered approximately 1,600 cases of Malaga, MayPole, Link, D&J, Soberano, and Win brand cigarettes, **Defendant Property 2**. The cigarettes were concealed behind empty plastic crates and plastic sheeting stacked from floor to ceiling at the door of the trailer. The MayPole brand cigarettes had distinctive red tape closing the open areas of the master cases. The driver of the tractor trailer provided false U.S. and Mexican customs documents indicating that the trailer's contents were "bundles". Per CBP regulations, the correct classification for cigarettes shipped in bulk in this manner would be "master cases".

37.    **Defendant Property 2** was seized by CBP and HSI after it was encountered on or about December 2, 2022, at the Pharr, Texas, POE.

38.    On or about November 28, 2022, investigators had responded to RGV Warehouse for a customs inspection. The inspection found hundreds of cases of MayPole and Win brand cigarettes. The MayPole brand cigarettes at RGV Warehouse had distinctive red tape closing the open areas of the master cases. Additionally, bank records show that, since 2021, RGV has purchased cigarettes from an overseas tobacco provider that deals in Win brand cigarettes.

39.    Customs data and related information showed that Malaga, MayPole, Link, D&J, Soberano, and Win brand cigarettes are considered "illicit whites", in that they are not legal for sale in the United States, nor in Mexico, their export destination. The cigarettes seized on December 2, 2022, also lacked tax and customs markings and stamps indicating they were permitted entry into U.S. commerce or were permitted into Mexico.

40.     In or about May of 2023, surveillance of RGV Lot showed that a vehicle associated with P1 (P1 Vehicle) was regularly present. P1 Vehicle was also parked at RGV Warehouse as recently as early February of 2024. Open-source corporate records also showed that RGV's corporate address has at times been listed at RGV Lot.

41.     Surveillance of RGV Lot showed that there were regularly between two and six shipping trailers present on the property at any given time. Surveillance also showed that the trailers most often left RGV Lot late in the evening and on weekends, and proceeded southbound towards the Pharr, Texas, port of entry. This is a common tactic for smugglers as it ensures the trucks cross when there is reduced manpower and surveillance at the port.

42.     On or about June 24, 2023, surveillance of RGV Lot showed two tractors, one red and one orange, parked in the lot attached to trailers. The trailer attached to the orange tractor had large blue lettering "BTI" on the side. On or about June 26, 2023, HSI observed P1 Vehicle leave RGV Lot followed by one orange tractor with a white trailer, and a red tractor with a greyish white trailer. Shortly after, the orange tractor and trailer was stopped at the Pharr, Texas, port of entry attempting to leave the United States. A customs inspection was conducted on the trailer and approximately 1,479 master cases of cigarettes were discovered hidden behind bundles of used clothing (a.k.a. "ropa usada"). In examining the cigarettes found in this trailer, CBP found Rancher, Bahrein, Carranza, and Distinguido brand cigarettes. The second red tractor was also stopped at the Pharr, Texas, port of entry attempting to leave the United States. A customs inspection was conducted on the trailer and CBP Officers found the trailer was filled with "ropa usada", which is prohibited from importation into Mexico.

43.    Both drivers provided U.S. export documents and Mexican import documents indicating the tractor trailers' cargoes consisted of "bundles". Per CBP regulations, the correct classification for cigarettes shipped in bulk in this manner would be "master cases".

44.    On or about June 9, 2023, investigators conducted a customs inspection on RGV Warehouse, and Bahrein brand cigarettes. Bahrein cigarettes were found hidden in the tractor trailer that was stopped at the Pharr POE on June 26, 2023. Bahrein cigarettes were a brand of "illicit whites" distributed by a cigarette provider located in the Miami, Florida, area. Cigarette smugglers operating in the McAllen, Texas, area routinely purchase cigarettes from this provider for smuggling into Mexico. Bank records for RGV also show wire transfers to accounts associated with the Miami provider.

45.    None of the cigarettes seized on June 26, 2023, had visible tax stamps from U.S. Federal or State authorities, those being required since the cigarettes had entered U.S. commerce when they were removed from customs custody and transported to RGV Lot, a non-bonded facility. The cigarettes also lacked any stamps or markings indicating that they were permitted entry into Mexico. Based on customs records and related information, Rancher, Bahrein, Carranza, and Distinguido brand cigarettes are not approved for sale in the U.S. or Mexico.

46.    The December 2022 and June 2023 seizures described above were part of a regular pattern and practice of smuggling conducted by persons associated with RGV. In sum, RGV's smuggling scheme operated as follows. RGV would order sea-shipping containers of cigarettes from producers both in and outside the United States. The cigarettes would be shipped to RGV through the In-Bond System. The cigarettes would then be loaded onto tractor trailers operated by entities not approved by CBP and disguised with a cover load. The cigarettes would then be transported to a non-bonded location, where they would be staged for a period of time. Then, the

cigarettes would be driven to a Port of Entry for smuggling into Mexico, with the driver carrying fraudulent documents (or no documents). The investigation determined that virtually all cigarettes handled by RGV were smuggled into Mexico from the United States in violation of law.

47.    **Customs and Wire Fraud Schemes**. Surveillance of RGV Store found that there is limited, if any, pedestrian and vehicle traffic that visits the store. According to publicly available information, RGV Store's hours of operation were Monday-Thursday, 9:30AM-6:00PM, and Friday 9:30AM-12PM, and closed Saturday and Sunday. According to surveillance, from November 2, 2022, to November 18, 2022, a total of 123 persons visited RGV's Hidalgo duty free store during business hours. Of those 123 persons, the surveillance showed that none left the store with large quantities of visible cartons or cases of cigarettes.

48.    RGV submitted documentation related to RGV Store's operation through a CBP internet portal via a customs broker. Customs filings from RGV for the surveillance period failed to include the necessary sales documentation required by regulation when first filed. Customs bonded warehouse and duty-free operators often will fail to submit sales documentation with customs filings when attempting to obscure non-compliant import-export practices. CBP then requested that RGV submit complete documentation for those dates.

49.    Once full documentation was received from RGV, records showed that RGV had provided 2,598 individual sales tickets completed for sales at RGV Store for the dates 11/2/2022 and 11/7/2022-11/16/2022. RGV failed to provide documentation for sales on 11/3/2022-11/5/2022, and 11/17/2022-11/18/2022. Investigators noted that, while RGV Store was closed (for weekends) on 11/5/2022-11/6/2022 and 11/11/2022-11/12/2022, RGV submitted documentation claiming 257 sales tickets for 11/6/2022 and 394 for 11/11/2022-11/12/2022. Surveillance also showed no entries or exits from RGV Store on those dates.

50.    RGV customs and business records showed that RGV appeared to run a significant loss on sales at RGV Store. First, RGV appeared to give away approximately one third (1/3) of the cigarettes it claims to sell out of RGV Store by awarding every "customer" a free carton of cigarettes for every two cartons purchased. Second, RGV appeared to sell the cartons it does receive cash for at a loss, as the documentation submitted to CBP by RGV indicates that each 10-pack of cigarettes sold is sold at roughly 10% less than RGV claims to pay to purchase the pack. Thus, RGV, on paper, appeared to accumulate operating losses of approximately 40% or more in its cigarette business. These figures directly contradict the statements made by P2 and P3 about RGV's financial arrangements and profitability, as well as RGV financial records as outlined below.

51.    Additional surveillance of RGV Store on 8/29/2023 and 8/30/2023 showed approximately ten (10) individuals visit the store on 8/29/2023, and approximately fifteen (15) individuals visit the store on 8/30/2023. As of November 2023, CBP record checks showed that RGV had failed to submit customs filings showing how it disposed of cigarettes that it had in inventory in August of 2023. CBP record checks run in January 2024 showed that RGV made six (6) customs filings for shipments of cigarettes cleared from RGV in-bond custody in the preceding months. Again, RGV failed to submit required sales documentation for those shipments, preventing CBP from verifying the dates and quantities of in-bond withdrawals and duty-free sales made by RGV for those shipments.

52.    In addition, records were seized from RGV in March 2024 and reviewed, showing that many of the names in the sales tickets had no record of border crossings into or out of the United States, nor any active visas for authorized entries. The sales tickets completed by RGV also contained numerous fictitious names and addresses. Thus, RGV was completing false sales tickets

to disguise the unlawful withdrawal of cigarettes from RGV Warehouse and their subsequent smuggling into Mexico. RGV was also submitting, and causing to be submitted, false information to CBP indicating that in-bond shipments of cigarettes were disposed of by RGV as required by applicable statute and regulation. These representations to CBP involved use of electronic systems that transmit information by wire in interstate commerce.

53.    **Pervasiveness of Fraudulent and Illegal Activity**. Based on the seizures made of smuggled goods linked to RGV, the discrepancies between the surveillance of RGV's customer traffic and RGV's claimed sales, the discrepancies between RGV's claimed sales practices and stated financial profitability, RGV's  regular and routine smuggling large quantities of cigarettes out of the U.S., and RGV's submission of incomplete and false customs records, RGV habitually violated customs laws and regulations and smuggled cigarettes from the U.S. into Mexico. RGV also engaged in a widespread scheme to commit customs fraud, fraud against the United States, and used wire communications to commit and facilitate its fraudulent activities. RGV's customs violations, smuggling activity, and fraudulent practices were pervasive and generated significant proceeds (as described below).

<u>MONEY LAUNDERING SCHEMES</u>

54.    **Summary of Money Laundering Schemes**. As shown by facts as alleged above and below, RGV engaged in a multifaceted money laundering operation. This operation involved the use of shell companies and straw persons to obscure the sources and recipients of funds, significant transactions to promote the smuggling and fraud schemes, and significant transactions involving the proceeds of the smuggling and fraud activity.

55.    **RGV Financial Operations**. RGV's account records from a prior operating account (RGV OPERATING ACCOUNT 1) for the period of 2/10/2021 through 10/31/2022

showed the following:

- Money deposits of approx. $1.61 million dollars, with the majority being cash, with teller notes from deposit slips stating that much of the money was received from duty-free sales[1];
- Incoming international wire transfers of approx. $1.65 million dollars from individuals and businesses in Mexico, often sent through Casas de Cambio;
- Outgoing domestic and international wire transfers of approx. $3.1 million dollars to known and suspected cigarette producers; and,
- Outgoing transfers, withdrawals, and payments for apparent business expenses (including payroll, large payments to involved parties including CC5, and cash withdrawals) of approx. $470,000.

RGV OPERATING ACCOUNT 1 was wound down and closed within approximately three months of investigator's inspection of RGV and interviews with P2 and P3 in August of 2022.

56.    RGV then opened RGV OPERATING ACCOUNT 2 on October 28, 2022. RGV OPERATING ACCOUNT 2 was opened by P2 and P3 with a $119,000 cashier's check from the closing of RGV OPERATING ACCOUNT 1. RGV OPERATING ACCOUNT 2 continued to show activity similar to that described above for RGV OPERATING ACCOUNT 1, including the following activity:

| RGV OPERATING ACCOUNT 2 Wire Activity April 2023 | | | | |
|---|---|---|---|---|
| Date | Routing | Recipient/Sender (Location) | Transaction Info | Amount |
| 4/4/2023 | Incoming | Business 1 (Mexico) | PAGO PROVEEDOR | $19,990.00 |
| 4/6/2023 | Outgoing | Tobacco Provider 1 (Middle East) | INVOICE | $60,000.00 |
| 4/12/2023 | Incoming | Business 1 (Mexico) | PAGO PROVEEDOR | $49,990.00 |
| 4/12/2023 | Outgoing | Tobacco Provider 1 (Middle East) | INVOICE | $42,500.00 |
| 4/24/2023 | Outgoing | Tobacco Provider 1 (Middle East) | INVOICE | $60,000.00 |
| 4/26/2023 | Outgoing | Tobacco Provider 2 (Vietnam) | REF No. | $16,500.00 |
| 4/27/2023 | Incoming | Business 2 (Mexico) | PAGO PROVEEDOR | $39,990.00 |
| 4/27/2023 | Outgoing | Tobacco Provider 3 (Hong Kong) | INV | $50,000.00 |
| 4/28/2023 | Incoming | Business 2 (Mexico) | PAGO PROVEEDOR | $1,840.00 |
| | | | Total Wires In | $111,810.00 |
| | | | Total Wires Out | ($229,000.00) |

[1] The investigation has shown that RGV makes almost zero valid duty-free sales from its RGV Store, meaning that this representation to the bank is demonstrably false.

| RGV OPERATING ACCOUNT 2 Wire Activity June 2023 | | | | |
|---|---|---|---|---|
| *Date* | *Routing* | *Recipient/Sender (Location)* | *Transaction Info* | *Amount* |
| 6/1/2023 | Outgoing | Provider 1 (Laredo, TX) | Purchase Merchandise | $56,510.00 |
| 6/6/2023 | Outgoing | Tobacco Provider 1 (Middle East) | INV | $50,000.00 |
| 6/8/2023 | Outgoing | Tobacco Provider 3 (Hong Kong) | Purchase Merchandise INV | $49,990.00 |
| 6/15/2023 | Incoming | Business 3 (Mexico) | PAGO PROVEEDOR | $59,980.00 |
| 6/16/2023 | Outgoing | Tobacco Provider 1 (Middle East) | INV | $55,000.00 |
| 6/22/2023 | Outgoing | Tobacco Provider 1 (Middle East) | | $55,000.00 |
| 6/26/2023 | Outgoing | Tobacco Provider 4 (Florida) | ESTIMATE | $50,000.00 |
| 6/27/2023 | Outgoing | Tobacco Provider 4 (Florida) | MERCHANDISE PURCHASE | $10,000.00 |
| | | | Total Wires In | $59,980.00 |
| | | | Total Wires Out | ($326,500.00) |

| RGV OPERATING ACCOUNT 2 Money Deposit Activity April 2023 | | | | | |
|---|---|---|---|---|---|
| *Date* | *In/Out* | *Amount* | *Date* | *In/Out* | *Amount* |
| 4/6/2023 | In | $71,933.53 | 4/19/2023 | Out | $7,400.00 |
| 4/24/2023 | In | $60,056.00 | 4/20/2023 | Out | $2,371.40 |
| 4/24/2023 | In | $54,000.00 | 4/14/2023 | Out | $2,350.00 |
| 4/27/2023 | In | $4,990.00 | | Total Out | $(12,121.40) |
| | Total In | $190,979.53 | | | |

| RGV OPERATING ACCOUNT 2 Money Deposit Activity June 2023 | | | | | |
|---|---|---|---|---|---|
| *Date* | *In/Out* | *Amount* | *Date* | *In/Out* | *Amount* |
| 6/1/2023 | In | $40,579.00 | 6/21/2023 | In | $29,000.00 |
| 6/2/2023 | In | $32,335.00 | 6/23/2023 | In | $28,000.00 |
| 6/5/2023 | In | $48,685.00 | 6/26/2023 | In | $22,500.00 |
| 6/7/2023 | In | $15,500.00 | 6/27/2023 | In | $10,000.00 |
| 6/8/2023 | In | $40,000.00 | | Total In | $298,599.00 |
| 6/13/2023 | In | $12,000.00 | | | |
| 6/16/2023 | In | $20,000.00 | 6/13/2023 | Out | $11,100.00 |
| | | | | Total Out | $(11,100.00) |

57.     From the above summarized wire transfer information, open-source record checks, and available customs information, Tobacco Provider 1 was a cigarette and tobacco provider located in the Middle East, and Tobacco Provider 3 was a commodity trading company that deals in tobacco with a presence in Hong Kong. Based on open-source records, witness interviews, and

customs records, Tobacco Provider 1 distributed counterfeit and "illicit whites" cigarettes. Investigators also determined that Tobacco Provider 4 was a tobacco and cigarette producer and provider located near Miami, Florida, that deals in various brands of "illicit whites" cigarettes, including Rancher brand cigarettes.

58.     RGV stopped using RGV OPERATING ACCOUNT 2 immediately after the June 26, 2023, seizure of cigarettes linked to RGV, and wired the remaining balance in the account to an account related to Tobacco Provider 4 on June 27, 2023.

59.     Additional financial records related to RGVs operations showed that, after winding down RGV OPERATING ACCOUNT 2 in June of 2023, RGV began using RGV OPERATING ACCOUNT 3 in early July 2023. RGV OPERATING ACCOUNT 3 showed activity similar to that described above, including the following:

| RGV OPERATING ACCOUNT 3 Wire Activity July-November 2024 | | | | |
|---|---|---|---|---|
| *Date* | *Outgoing* | *Recipient/Sender (Location)* | *Transaction Info* | *Amount* |
| 11/8/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $19,700.00 |
| 10/30/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $25,000.00 |
| 10/27/2023 | Outgoing | Transportation Provider (Florida) | POP SERVICES | $3,100.00 |
| 10/24/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $27,000.00 |
| 10/17/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $25,000.00 |
| 10/11/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $27,000.00 |
| 10/10/2023 | Outgoing | Transportation Provider (Florida) | POP SERVICES | $3,100.00 |
| 9/18/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $40,000.00 |
| 9/12/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $25,000.00 |
| 8/31/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $40,000.00 |
| 8/14/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $5,220.00 |

| 8/10/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $22,000.00 |
|---|---|---|---|---|
| 8/10/2023 | Outgoing | Transportation Provider (Florida) | POP SERVICES | $3,100.00 |
| 8/8/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $45,000.00 |
| 8/4/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $40,000.00 |
| 8/1/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $20,000.00 |
| 7/26/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $20,000.00 |
| 7/25/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $25,000.00 |
| 7/21/2023 | Outgoing | Transportation Provider (Florida) | POP SERVICES | $3,100.00 |
| 7/13/2023 | Outgoing | Tobacco Provider 4 (Florida) | POP OTHER MERCHANDISE | $42,000.00 |
| 7/10/2023 | Outgoing | Tobacco Provider 4 (Florida) | (none) | $30,000.00 |
| | | | Total Wires In | $0 |
| | | | Total Wires Out | ($490,320.00) |

60.     Generally, cigarette smugglers and associated money launderers will change bank accounts and alter financial arrangements if they suspect law enforcement interest or action. The facts as alleged show that RGV has twice altered its financial arrangements during the investigation in response to overt law enforcement action to counter their cigarette smuggling and money laundering activity. These changes occurred first in October 2022 (after customs inspections in August 2022) and again in June 2023 (after a June 2023 seizure).

61.     RGV also used couriers to bring U.S. dollars in cash into the U.S. from Mexico for deposit into RGV's bank accounts.

62.     **Pervasiveness of Illegal Activity**. As shown by the facts alleged above, RGV engaged in a widespread scheme to smuggle cigarettes from the U.S. into Mexico and defraud the U.S. government. The facts also show that RGV engaged in widespread money laundering activity to accomplish the following: (1) obscure the sources and ultimate recipients of funds related to the

26

conspiracy's smuggling and fraud activities; (2) conduct transactions to promote the smuggling and fraud schemes; and (3) conduct transactions involving the proceeds of the smuggling and fraud schemes. RGV's laundering activity was pervasive and implicated significant illicit proceeds.

CONCLUSION

63.     The Defendant Properties constitute contraband, facilitating property, and proceeds of the above-described illegal and fraudulent activity. The Defendant Properties were used in the listed offenses, were proceeds of the listed offenses, and were contraband due to their use in the listed offenses. As such, the Defendant Properties are subject to forfeiture.

**NOTICE TO ANY POTENTIAL CLAIMANT**

YOU ARE HEREBY NOTIFIED if you assert an interest in the Defendant Property subject to forfeiture and want to contest the forfeiture, you must file a verified claim which fulfills the requirements set forth in Rule G of the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions.  The verified claim must be filed no later than thirty-five (35) days from the date this complaint was sent to you in accordance with Rule G(4)(b); or, if this Complaint was not sent to you, no later than 60 days after the first day of publication of notice on an official internet government forfeiture site, in accordance with Rule G(5)(a)(ii)(B).

An answer or a motion under Federal Rule of Civil Procedure 12 must be filed no later than twenty-one (21) days after filing the claim.  The claim and answer must be filed with the United States District Clerk for the Southern District of Texas, either electronically or at the United States Courthouse, 515 Rusk Avenue, Houston, Texas 77002. A copy must be served upon the undersigned Assistant United States Attorney either electronically or at the address provided in this Complaint.

## RELIEF REQUESTED

The United States will serve notice, along with a copy of the Complaint, on the property owner and on any other persons who reasonably appear to be potential claimants. The United States seeks a final judgment forfeiting the Defendant Property to the United States and any other relief to which the United States may be entitled.

Respectfully submitted,

NICHOLAS J. GANJEI
United States Attorney
Southern District of Texas

By:    */s/ Theodore V. Parran, III*
Theodore V. Parran, III
Assistant United States Attorney
Southern District of Texas
1701 W. Highway 83, Suite 600
McAllen, Texas 78501
Tel: 956-928-8256

<u>VERIFICATION</u>

I, Matthew Shoemaker, a Special Agent employed by Homeland Security Investigations, declare under the penalty of perjury, as provided by 28 U.S.C. § 1746, that I have read the foregoing Verified Complaint for Civil Forfeiture In Rem and Notice to Potential Claimants, and that the facts stated in this complaint are based upon my personal knowledge, upon information obtained from other law enforcement personnel, and upon information I obtained in the course of my investigation, and they are true and correct to the best of my knowledge and belief.

Executed on the ___15th___ day of May, 2025.

MATTHEW C
SHOEMAKER Digitally signed by MATTHEW
C SHOEMAKER
Date: 2025.05.15 14:41:41
-05'00'

_____
Matthew Shoemaker, Special Agent
Homeland Security Investigations